IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RICK CRUZ-MANJARREZ                              CV 04-1811 AS

              Plaintiff,                              FINDINGS AND
                                                     RECOMMENDATION

       v.

CITY OF PORTLAND, OFFICER GORE,
OFFICER PRESTON, OFFICER JONES,
OFFICER POOL, OFFICER BAXTER,
and DETECTIVE HALLIBURTON,

              Defendants.

ASHMANSKAS, Magistrate Judge:

## INTRODUCTION

       Plaintiff  brings this civil rights action pursuant to 42 USC § 1983 *pro se.*  Defendants'

Motions to Dismiss  (# 11 and # 14) were granted with respect to the K-9 dog Deny and with

respect to plaintiff's Eighth Amendment claims against all defendants.  Defendants' Motions to

Dismiss plaintiff's claims against City of Portland and Portland Police Bureau, and plaintiff's

Fourteenth Amendment equal protection claims against the remaining defendants were dismissed

 1  - FINDINGS AND RECOMMENDATION

without prejudice (# 21 and #36).  Plaintiff has not replead those claims.  Defendants now move

for summary judgment on all remaining claims pursuant to *FRCP* 56(c) (# 43).

LEGAL STANDARDS

Summary judgment is appropriate  if no genuine issue exists regarding any material fact

and the moving party is entitled to judgment as a matter of law.  *Fed R Civ P* 56(c).  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett,* 477 US 317,

323 (1986).  Once the moving party does so, the non-moving party must go beyond the pleadings

and designate specific facts showing a genuine issue for trial.  *Id* at 324.  The court must "not

weigh the evidence or determine the truth of the matter, but only determines whether there is a

genuine issue for trial."  *Balint v. Carson City, Nevada,* 180 F3d 1047, 1054 (9th Cir 1999).  A

"'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'"

does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge

Corp.,* 865 F2d 1539, 1542 (9th Cir), *cert denied,* 493 US 809 (1989), quoting *Anderson v.

Liberty Lobby, Inc.,* 477 US 242, 249-50 (1986).

The substantive law governing a claim or defense determines whether a fact is material.

*T.W. Elec. Ser., Inc. v. Pacific Elec. Contractors Ass'n.,* 809 F2d 626, 630 (9th Cir 1987).  The

court must view the inferences drawn from the facts in the light most favorable to the non-

moving party.  Thus, reasonable doubts about the existence of a factual issue should be resolved

against the moving party.  *T.W. Elec. Ser., Inc.,* 809 F2d at 630-31.  However, when the non-

moving party's claims are factually implausible, that party must come forward with more

persuasive evidence than would otherwise be required.  *California Architectural Bldg. Prods.,

Inc. v. Franciscan Ceramics, Inc.,* 818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006

(1988).

In civil rights cases involving a plaintiff proceeding *pro se,* this court construes the pleadings liberally and affords the plaintiff the benefit of any doubt. *McGuckin v. Smith,* 974 F2d 1050, 1055 (9th Cir 1992), *overruled on other grounds by WMX Tech., Inc. v. Miller,* 104 F3d 1133, 1136 (9th Cir 1998).

FACTS

Because all material facts must be viewed in the light most favorable to the non-moving party, this court will view the evidence in the light most favorable to plaintiff. The following is a summary of the facts contained in the parties' supporting affidavits and deposition excerpts.[1]

On May 6, 2004, Plaintiff Cruz-Manjarrez was under the influence of methamphetamine. He had not eaten or slept for three or four days. Cruz-Manjarrez Depo. p. 11. Cruz-Manjarrez was addicted to methamphetamine, and had been unemployed since 2002. *Id.,* at 10-11. The methamphetamine caused severe dehydration, and Cruz-Manjarrez "couldn't talk because [his] tongue was sticking to [his] mouth." *Id.,* at 15. Cruz-Manjarrez testified that, on May 6, 2004, he was walking to visit a friend because he did not have a car. *Id.,* at 27-28. He noticed a "little dirt bike" sitting in defendant Officer Jones's driveway. The motorcycle belonged to Officer Jones. Cruz-Manjarrez decided to sit on the motorcycle. It was approximately midnight, based on the Emergency Room records.

Officer Jones returned home. There is no evidence as to whether Officer Jones was in uniform. Cruz-Manjarrez alleges that a gun was pointed at him from a maroon sedan. Plaintiff's

---

[1]Citations to affidavits and depositions are identified by the last name of the affiant or deponent, and citations are to the paragraph(s) of the affidavit or declaration, or page(s) of the deposition transcript. All other citations are to the exhibit number of the parties' submissions.

Response, p. 2. Officer Jones pointed his gun at Cruz-Manjarrez through his partially opened car window and shouted at him. Cruz-Manjarrez Depo. at 42. Officer Jones testified that he identified himself as a police officer and ordered Cruz-Manjarrez to stop. Jones Aff. p. 2. Cruz-Manjarrez dropped the motorcycle and ran.

Officer Jones called 911 and reported a burglary. Officer Gore arrived with a police dog, Deny. Gore Aff. at ¶ 4. Officer Jones told Officer Gore that his garage had been burglarized that some police equipment was missing, along with a flight bag and some tools, and that there was the possibility that knives and pepper spray had been taken. Gore Aff. at ¶ 5. Officer Jones told Officer Gore that he confronted the suspect with his gun and shouted commands, but the suspect ran. *Id*

Cruz-Manjarrez testified that he was looking for a way to escape. Cruz-Manjarrez Depo. at 42. He ran through some yards and "jumped over a couple [of] fences back there." *Id.* at 43. He hid underneath a pick-up truck because he could not run any farther. *Id.* at 45. He thought his "heart was going to blow up" and he couldn't breathe. *Id*

Cruz-Manjarrez estimated that he hid under the pick-up truck for "probably six, seven minutes. They had a perimeter pretty much sealed fast." *Id.* at 46. Cruz-Manjarrez testified that he "could hear the battalion, 'Close this street over here. Close this street,' and then I could hear them talking about that, and then minute–a few minutes later then I heard a dog on the other side of the fence going, 'Ruff, ruff, ruff,' and I go, 'Oh no.'" *Id* at 47. Cruz-Manjarrez heard the dog barking at the front end of the fence "and they open the fence up. The dog ran right past me...and the next thing you know he came...right on top of my head and just started biting me...." *Id* Cruz-Manjarrez heard people run past. "I didn't see them, but I heard them...." *Id* " I'm a

felon, and I'm not supposed to possess any weapons or firearms whatsoever; so I threw it [a

dagger], hoping they wouldn't find it so I wouldn't get charged with that charge." *Id* at 52.  Cruz-

Manjarrez heard the commands "Show your hands," and "Kick your feet out.  Show yourself,"

but could not obey because the dog "was dragging me towards the top of the car." *Id* at 53.

Officer Gore testified that he realized the suspect was hiding under the truck when the

dog growled.

> I commanded "Let me see your hands" to the person under the truck.
> I got no reply from the suspect and did not see his hands come out
> from the truck.  In fact, I could not see him at all.   I gave Deny the
> bite command because I feared that I or my fellow officers could be
> ambushed by the suspect, who was within arms reach of my legs.  I
> also knew I was trailing a burglary suspect, who was probably armed
> with some type of weapon.  Deny went under the truck and bit the
> suspect and began pulling him out.

Gore Aff. ¶ 7.

Officer Gore found a dagger under the truck, later identified by Officer Jones as his

property that had been kept in his garage.  *Id* at  ¶ 9.

Cruz-Manjarrez testified in his deposition that he was pulled out from under the truck:

Q  So how did they pull you out from under the car?

A  I think they got one of my feet or one of my legs, because, you know, I tried
   to move as far that way because the dog was trying to pull me out that way.
   I know if the dog was going to pull me out, I'm going to get beat up, you
   know, bitten, you know, harder than – or worse than what I had got bitten.
   It already hurt so bad, and I scooted – I was fighting against him, because
   he was pulling me this way, and I was trying to go this way, go out that way,
   and somehow – they might have looked down there and saw me and reached
   in there.  I don't know if that's what they did, but then they just pulled me right
   out, and then I sat – I sat on my behind like this for a second, and the dog came
   from --
Q  Hang on.  What do you mean you were fighting against them?  Describe
   what you mean by that.

 5  - FINDINGS AND RECOMMENDATION

A  Well, they wanted me to go this way to get out.

Q  Where the – toward the "leg-out" direction?

A  To the side of the truck.

Q  Right.

A  That's where the police officers were hanging out right there.  The canine was at the top of the car, trying to pull me out from the front end of the -- or the back end of the car – I can't remember which – but one of ends he was trying to pull me out.  So if he is going to try to pull me out that way, I'm going to get bit worse; okay?  There's no – I already knew that.  I was trying to go this way against him because that's where the police were, and that's who can stop the dog from biting me.
.  .  .
Q  So the officers got you out from under the car, and what happened?

A  Okay.  They dragged me out.  You know, I was scraped on my back and everything.  I sat up for a second before they decided to handcuff me and, you know, put me down.  The dog – the dog came around the corner and took one more bite right here on my ribs.

Q  On your left side?

A  Yeah.  It's right here.

Q  And you're lifting up your shirt, and you can see there are a couple spots there, and those are the scars from the bite?

A  Yeah.  After I sat up and after all that ordeal, he came around the corner and took another bite right there.

Q  Okay.

A  And then the police officers proceeded to throw me face-down and doing their handcuff situation, and that was it, and then Officer Pool was the one that escorted me out of there to his car and, like said, just dragging me with my –from my hood where I just had – those four stitches on my neck –  I was bleeding profusely.  I was telling him, "It hurts.  You know, I can't walk that fast."  He probably couldn't understand me because, as I said before, I was dehydrated.

Supp. Moede Aff., pp. 6-10.

However, in his Opposition to Defendants' Motion for Summary Judgment, Cruz-Manjarrez asserts that "I got pulled out and managed to end up in a seated position. The officers grabbed my arms and put them behind my back therefore exposing my mid section. The K-9 came around from the front of the truck and took a bite at my left rib section when I was helpless and restrained." Plaintiff's Response and Opposition to the Motion for Summary Judgment, p. 2.

Gore testified that once he could see both of Cruz-Manjarrez's hands he called the dog off the bite and put him in a "down stay position." Gore Aff. ¶ 8.

Cruz-Manjarrez was arrested. Defendant Officer Pool escorted Cruz-Manjarrez to the hospital. Officer Pool knew that Cruz-Manjarrez had fled defendant Officer Jones at gunpoint and failed to obey Jones's orders to stop. Officer Pool knew that Cruz-Manjarrez was a felony suspect and that he was suspected of stealing police equipment, including a knife and pepper spray. Officer Pool knew that Cruz-Manjarrez had been armed with a knife moments before he was arrested. Officer Pool gripped Cruz-Manjarrez's left arm with his right hand because Officer Pool's right arm is his strongest arm. Pool Aff. ¶ 6. Officer Pool wanted to ensure that he could overcome any attempt Cruz-Manjarrez might make to flee. Pool Aff. *¶ 7.* Officer Pool used the least forceful escort hold approved by the Portland Police Bureau. Officer Pool could not see all of Cruz-Manjarrez's injuries because they were covered by his sweatshirt. Pool Aff. ¶ 8. Cruz-Manjarrez complained of pain, and alleges that Officer Pool intentionally caused excess pain by unnecessarily pressing on his wounds.

Cruz-Manjarrez received four stitches to the skin on his left collarbone. He sustained at least three puncture wounds in his upper left arm, puncture wounds on the left side of his rib cage, and a three by four inch scrape of the skin on the left side of his back.

7 - FINDINGS AND RECOMMENDATION

Cruz-Manjarrez was taken to Southeast Precinct.  Defendant Detective Willie Halliburton was the on-call Detective.  His duties included assisting uniformed officers with custody interviews.  Detective Halliburton was asked to interview Cruz-Manjarrez.  Cruz-Manjarrez was handcuffed in the holding cell.  Detective Halliburton introduced himself to Cruz-Manjarrez as the Detective who would be interviewing him.  Cruz-Manjarrez asked for an attorney and the interview ended.  Detective Halliburton asserts that the total amount of time he was in Cruz-Manjarrez's presence was three to five minutes.  Halliburton Aff. ¶¶ 1-8.

The Multnomah County District Attorney charged Cruz-Manjarrez with Burglary in the Second Degree, Theft in the First Degree, Theft in the Second Degree, and Felon in Possession of a  Restricted Weapon.  Moede Aff., Ex. 2.  Cruz-Manjarrez was convicted on all counts after trial to the court.  Moede Aff., Ex. 3.  Cruz-Manjarrez has admitted that he does not have any claim against defendant Officers Jones, Preston and Baxter.   Moede Aff., Ex. 1.

DISCUSSION

Cruz-Manjarrez contends that he was apprehended through the use of  "excessive force" under the Fourth Amendment.  He argues that defendant Gore permitted the police dog to bite him unnecessarily and after he was restrained, and that defendant Pool used excessive force by holding plaintiff's arm as he was escorted to the hospital.  In addition, Cruz-Manjarrez asserts state law claims for intentional infliction of emotional distress and assault and battery.

I. Excessive Force

    A.  Use of the Police Dog

The Ninth Circuit has determined that an officer's ordering a police dog to bite a suspect does not pose more than a remote possibility of death in most circumstances.  *Brewer v.*

*City of Napa,* 210 F3d 1093, 1098 (9th Cir 2000)("[T]he *Garner* analysis with respect to deadly

force generally does not apply to the use of police dogs.")

In determining the reasonableness of a seizure effected by non-deadly force, the court

balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests"

against "the countervailing government interests at stake." *Miller v. Clark Co.,* 340 F3d 959,

964 (9th Cir 2003)(quoting *Graham v. Connor,* 490 US 386, 396 (1989)).  First, the court must

assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the

type and amount of force inflicted.  Second, the court must assess the importance of the

government interests at stake by evaluating:  (1) the severity of the crime at issue, (2) whether

the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the

suspect was actively resisting arrest or attempting to evade arrest by flight.  Third, the court must

balance the gravity of the intrusion on the individual against the government's need for that

intrusion to determine whether it was constitutionally reasonable.  *Id*

The type and amount of force used to seize Cruz-Manjarrez was considerable.  The police

dog was trained to bite and hold a suspect.  I conclude that the intrusion on Cruz-Manjarrez's

Fourth Amendment interests was a serious one.

As to the second factor, the importance of the government's interest, the court must

evaluate the *Graham* factors, namely:

> (1)  the severity of the crime at issue, (2)  whether the suspect
> posed an immediate threat to the safety of the officers or
> others...(3)  whether [the suspect was] actively resisting
> arrest or attempting to evade arrest by flight, and any other
> exigent circumstances [that] existed at the time of the arrest.

*Deorle v. Rutherford,* 272 F3d 1272, 1280 (9th Cir 2001)  *cert denied,* 536 US 958 (2002),

*citing Chew v. Gates,* 27 F3d 1432, 1442 (9th Cir 1994), *cert denied,* 513 US 1148 (1995).

First, the crimes at issue were severe.  Cruz-Manjarrez was suspected of burglarizing a garage and stealing a bag containing knives and pepper spray.   The government has an undeniable legitimate interest in apprehending criminal suspects.  *United States v. Hensley,* 469 US 221, 229 (1985).  Cruz-Manjarrez was convicted of Burglary in the Second Degree, Theft in the First Degree, Theft in the Second Degree and Felon in Possession of a Restricted Weapon for his actions on May 6, 2004.  This factor weighs heavily in favor of the defendants.

Second, Cruz-Manjarrez posed an immediate threat to the safety of the officers. Defendant Gore sent the dog to search for Cruz-Manjarrez in the dark with the knowledge that he was a fleeing, possibly armed, burglary suspect.  Gore argues that Cruz-Manjarrez was fleeing and had failed to obey orders to halt. Construing the evidence in the light most favorable to plaintiff, Cruz-Manjarrez fled from an man purporting to be a police officer,  pointing a gun at him from the partially lowered window of a maroon sedan.  However, according to his deposition, Cruz-Manjarrez did know by the time he hid under the truck that police had arrived, secured the area, and were searching for him.  Cruz-Manjarrez testified that he was under the truck for six to seven minutes before the dog attacked him.  He testified that he could hear the dog scratching and barking before it entered the yard in which he was hidden.  Cruz-Manjarrez did not surrender, but remained hidden under the truck.  Defendant Gore could not see Cruz-Manjarrez, and ordered him to show his hands.  Gore Aff. ¶ 7.  Cruz-Manjarrez did not respond to the order due to his drug-induced dehydration.  Defendant Gore ordered the dog to bite and hold the suspect.  Defendant Gore did not see where the dog was biting Cruz-Manjarrez or know the extent of his injuries.  This factor weighs heavily in favor of defendants.

Third, Cruz-Manjarrez knew that police were searching for him, and he attempted to evade arrest by remaining hidden under the truck.  Defendant Gore believed that Cruz-Manjarrez had jumped or climbed several tall fences, and could do so again.  This factor weighs heavily in favor of defendants.

The dispositive question is whether the force that was applied was reasonably necessary under the circumstances.  The officers attempted less forceful means to arrest Cruz-Manjarrez, including ordering him to halt and pursuing him on foot.  Cruz-Manjarrez acknowledged that the officers acted reasonably:

> [The police] probably felt threatened for their lives, you know.
> Yeah, that's probably why they sent the dog in first.  But, you
> know, what if I did that and killed the dog?   No, that wouldn't
> have been a good idea.  That's probably what they were scared
> about, maybe me hurting one of them.
>
> I don't know if they knew I had a knife at the time or not.  You
> know, that's a chance the police officers themselves take....

Moede Aff., Ex. 1, p. 57.

The undisputed material facts show that defendant Gore's action in ordering the dog to capture Cruz-Manjarrez was reasonably necessary under the circumstances.  Defendants' Motion for Summary Judgment on Cruz-Manjarrez's claim for excessive force by the use of the police dog in violation of his Fourth Amendment rights should be granted.

At deposition, Cruz-Manjarrez testified under oath that the dog bit him on the side after he was pulled out from under the truck, and before he was handcuffed.  In opposition to this motion, Cruz-Manjarrez asserts in an unsworn memorandum that "[T]he officers grabbed my arms and put them behind my back therefore exposing my mid section.  The K-9 came around from the front of the truck and took a bite at my left rib section when I was helpless and

 11  - FINDINGS AND RECOMMENDATION

restrained."  Plaintiff's Response, p. 2.  The question is whether Cruz-Manjarrez has raised a

genuine issue of material fact as to whether the police officers allowed the dog to bite him after

he was restrained and of no threat to the officers' safety.

Defendants contend that plaintiff's recent assertion that he was bitten after he was

restrained should be dismissed as a "sham affidavit."  "The general rule in the Ninth Circuit is

that a party cannot create an issue of fact by an affidavit contradicting his prior deposition

testimony."  *Kennedy v. Allied Mut. Ins. Co.,* 952 F2d 262, 266 (9th Cir 1991), *citing Foster v.*

*Arcata Associates,* 772 F2d 1453, 1462 (9th Cir 1985) *cert denied,* 475 US 1048 (1986).  "If a

party who has been examined at length on deposition could raise an issue of fact simply by

submitting an affidavit contradicting his own prior testimony, this would greatly diminish the

utility of summary judgment as a procedure for screening out sham issues of fact."  *Foster,* 722

F2d at 1462.  This rule (sometimes called the *"Foster-Rabodenko* rule"), applies to conflicts

between affidavits and interrogatory responses as well as deposition testimony.  *School Dist. No.*

*1J, Multnomah County v. ACandS, Inc.,* 5 F3d 1255, 1264 (9th Cir 1993).  However, the Ninth

Circuit has held that the *Foster-Rabodenko* rule should be applied with caution.  *Kennedy,* 952

F2d at 266.  The non-moving party is not precluded from "elaborating upon, explaining or

clarifying prior testimony" and  "minor inconsistencies that result from an honest discrepancy, a

mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."

*Messick v. Horizon Indus., Inc.,* 62 F3d 1227, 1231 (9th Cir 1995).

Assuming that Cruz-Manjarrez would now  swear, in contradiction to his deposition

testimony, that he was bitten after he was restrained, there is no reason to create an exception to

the general rule.  Plaintiff described the entire incident at length in his deposition, and his

unsworn, contradictory statements in opposition to Summary Judgment do not raise a genuine issue of material fact.

B.  The Escort Grip

Cruz-Manjarrez contends that Defendant Pool used excessive force by gripping his injured arm as he escorted plaintiff from the patrol car to the hospital.  Giving plaintiff the benefit of the doubt, the type and amount of force inflicted by use of the escort hold on his injured arm constitutes an intrusion on plaintiff's Fourth Amendment rights.  However,  the government has a strong interest in controlling a burglary suspect who has demonstrated his ability and intent to flee and elude police.  This factor weighs heavily in favor of defendants.

Defendant Pool reasonably believed that Cruz-Manjarrez posed a serious flight risk given the events surrounding his capture.  Pool Aff. ¶¶ 2-5.  Defendant Pool was aware that a dagger had been discovered near where Cruz-Manjarrez was hiding.  Defendant Pool maintained a firm grip on plaintiff to ensure that he would not try to flee.  Pool Aff. ¶ 6.  Defendant Pool knew that plaintiff had been bitten on the left arm, but gripped plaintiff's left arm because Pool's right arm is stronger, and Pool wanted to ensure that he was in the best position to overcome any escape attempt.

Defendant Pool contends that he did not realize he was causing the degree of pain alleged by plaintiff.  Plaintiff's clothes concealed his bite wounds.  Pool Aff.¶ 8.  Cruz-Manjarrez concedes that defendant Pool did not know the extent of his injuries.  According to Cruz-Manjarrez, Pool saw his injuries for the first time at the hospital.  Pool Aff. ¶ 9, Moede Aff., Ex. 1, p. 67.  At deposition, Cruz-Manjarrez stated that defendant Pool "probably realized it when they cut my shirt off, and then he saw all the lacerations that occurred to me from the incident,

and maybe that's why he was nicer to me on the way out of there." *Id* Plaintiff stated that when

Pool knew where his injuries were:

> [H]e wasn't pulling, because I just got stitched up.  So he must
> have understood, you know, the extremity of the lacerations were,
> but I don't know if he understood that at the time when he did that
> when I had my sweatshirt on.  It was painful.

Moede Aff. Ex 1, p. 17.

However, in his Opposition to Defendants' Motion for Summary Judgment, Cruz-

Manjarrez asserts that "Pool had knowledge of bites, blood was visible, I told him where it hurt

and he still chose to apprehend me directly on my wounds."  Plaintiff's Opposition, p. 4.  This

unsworn statement, in contradiction to prior sworn testimony, does not raise a genuine issue of

material fact.

Defendant Pool's reasonable need to keep a firm hold on Cruz-Manjarrez outweighs the

temporary discomfort that plaintiff experienced on the way to the hospital.  Defendants' Motion

for Summary Judgment on the claim that the use of the escort hold constituted excessive force in

violation of the Fourth Amendment should be granted.

II.  Defendants Preston, Jones, Baxter, and Halliburton

A.  Defendant Preston

As to defendant Preston, Cruz-Manjarrez testified that "I don't remember what he did."

Moede Aff., Ex. 1, p. 72-74.  There is no genuine issue of material fact.  Defendant Preston's

Motion for Summary Judgment should be granted.

B.  Defendant Jones

Cruz-Manjarrez testified "I don't have any problems with Officer Jones there."  Moede

Aff., Ex. 1, p. 71.  Defendant Jones did not have any physical contact with Cruz-Manjarrez.

14  - FINDINGS AND RECOMMENDATION

Jones Aff. ¶ 3.   There is no genuine issue of material fact.  Defendant Jones's Motion for

Summary Judgment should be granted.

    C.  Defendant Baxter

Plaintiff concedes that he has no claim against defendant Baxter, "[u]nless officer Baxter

was the one that slammed me."  Moede Aff. Ex. 1, p. 71-72.  "That's right.  That's what I'm

saying.  If Officer Baxter had nothing to do with my arrest,  I don't have any problems with him."

*Id*  Officer Baxter is a woman, and she had no physical or verbal contact with Cruz-Manjarrez.

Baxter Aff. ¶¶ 1-5.  Defendant Baxter's Motion for Summary Judgment should be granted.

    D.  Defendant Halliburton

Plaintiff concedes that he has no claim against defendant Halliburton unless "he's the one

that had the say to keep me handcuffed."  Moede Aff., Ex. 1, p. 74.  It is precinct policy to

handcuff persons in the holding cell.  Halliburton Aff. ¶ 7.  Defendant Halliburton's Motion for

Summary Judgment should be granted.

III.  State Law Claims

    A.  Assault and Battery

Under Oregon law the question in an assault or battery claim against a police office

acting in the course of official duty is whether the force used in making the arrest is reasonable.

*Gigler v. City of Klamath Falls,* 21 Or App 753, 763 (1975).   "That is, while there must be an

intent to injure, the word 'injure' refers to legal injury, and does not include injury that was the

result of reasonable force used in the performance of the officer's duties."  *Saberi v. City of*

*Portland,* 2006 WL 2707995 (D Or 2006), *citing Cook v. Kinzua Pine Mills Co.,* 207 Or 34, 48

(1956).

 15  - FINDINGS AND RECOMMENDATION

As discussed above, neither the use of the police dog nor the escort hold constituted excessive force in the arrest of Cruz-Manjarrez.  Accordingly, defendants' Motion for Summary Judgment should be granted as to the assault and battery claims.

B.  Intentional Infliction of  Severe Emotional Distress

To establish a claim for intentional infliction of severe emotional distress, Cruz-Manjarrez must demonstrate that (1)  defendants intended to inflict severe mental or emotional distress; (2)  defendants' acts caused him severe mental or emotional distress; and (3) defendants' acts consisted of "some extraordinary transgression of the bounds of socially tolerable conduct" and/or exceeded "any reasonable limit of social toleration."  *Patton v. JC Penney Co.,* 301 Or 117, 122 (1986), *quoting Hall v. The May Dept. Stores,* 292 Or 131 (1981). If no reasonable juror could differ on the issue of whether defendants' conduct was extreme and outrageous, the court may decide the issue.  *Pakos v. Clark,* 253 Or 113, 132 (1969).

As discussed above, construing the evidence in the light most favorable to Cruz-Manjarrez, defendants did not use excessive force in apprehending, arresting, and transporting plaintiff under the circumstances.  Cruz-Manjarrez was an armed fleeing felon, who failed to surrender peacefully when he had an opportunity to do so.  In addition, Cruz-Manjarrez testified that defendant Pool did not intentionally try to hurt him.  No reasonable juror could find that defendants' conduct was extreme or outrageous, and defendants' Motion for Summary Judgment should be granted.

## RECOMMENDATION

For the reasons set forth above, defendants' Motion for Summary Judgment (# 43) should be granted as to all remaining claims and this case should be dismissed.

SCHEDULING ORDER

The above Findings and Recommendations will be referred to a United States District

Judge for review.  Objections, if any, are due October  19, 2006.  If no objections are filed,

review of the Findings and Recommendation will go under advisement on that date.  If

objections are filed, a response to the objections is due November 2, 2006, and the review of the

Findings and Recommendation will go under advisement on that date.

DATED this 4th day of October 2006.


/s/Donald C. Ashmanskas
DONALD C. ASHMANSKAS
United States Magistrate Judge

17  - FINDINGS AND RECOMMENDATION